PLYMOUTH CANTON COMMUNITY CRIER, INC v PROSE

Docket No. 210896. Submitted January 12, 2000, at Detroit. Decided September 29, 2000, at 9:05 A.M.

Plymouth Canton Community Crier, Inc., and Fleet Street Association, II, brought an action in the Wayne Circuit Court against Thomas Prose and others, seeking to have the defendants enjoined from interfering with the plaintiffs' use of a portion of the defendants' lot for loading and unloading vehicles serving the plaintiffs' business located in an adjoining lot. The plaintiffs claimed that the use was within the scope of an express easement agreement executed by the defendants' predecessor in interest and the plaintiffs' predecessors in interest. Alternatively, the plaintiffs claimed that if the use was not covered by the express easement, a prescriptive easement for the use had been established. After a trial on stipulated facts, the court, Cynthia D. Stephens, J., decided in favor of the plaintiffs, finding that although the express easement did not apply to the disputed use, a prescriptive easement had been established. The defendants appealed, and the plaintiffs cross appealed the trial court's ruling with respect to the scope of the express easement.

The Court of Appeals *held*:

1. An easement by prescription results from use of another's property that is open, notorious, adverse, and continuous for a period of fifteen years.

2. Exclusive use, in the sense of use by only one individual or entity, of another's land is not required to establish a prescriptive easement. No merit lies in the defendants' contention that a prescriptive easement had not been established because the plaintiffs, their predecessors, and the defendants' predecessor all used the easement area for loading and unloading.

3. Adverse or hostile use is use that is inconsistent with the right of the owner such as would entitle the owner to a cause of action against the intruder for interference with an interest in property. Use of another's property qualifies as adverse when made under a claim of right when no right exists. A prescriptive easement may be established with a use that is made pursuant to the terms of an intended but imperfectly created servitude. In this case, the plaintiffs' predecessors and the defendants' predecessor intended to

include loading and unloading within the scope of the easement, but failed to articulate that intent in the easement agreement. A prescriptive easement was established because use was made pursuant to a mistaken interpretation that the express easement included loading and unloading.

4. The trial court did not err in determining that the plain language of the easement agreement does not permit the plaintiffs to stop their vehicles in the easement area for purposes of loading or unloading. The trial court correctly concluded that it could not consider parol evidence of the intended scope of the easement agreement because the defendants were not parties to the negotiation over the agreement and no indication exists that the defendants otherwise should have been on notice regarding the intended scope of the agreement.

Affirmed.

1. EASEMENTS — PRESCRIPTIVE EASEMENTS.

An easement by prescription results from use of another's property that is open, notorious, adverse, and continuous for a period of fifteen years (MCL 600.5801; MSA 27A.5801).

2. EASEMENTS — PRESCRIPTIVE EASEMENTS — ADVERSE OR HOSTILE USE.

Adverse or hostile use, for purposes of easements by prescription, is use inconsistent with the right of the owner, without permission asked or given, use such as would entitle the owner to a cause of action against the intruder for interference with an interest in property.

3. EASEMENTS — PRESCRIPTIVE EASEMENTS — IMPERFECTLY CREATED SERVITUDES.

A use that is made pursuant to the terms of an intended but imperfectly created servitude, e.g., a use intended by parties to an express written agreement but not reflected in the agreement, can establish an easement by prescription where all the other requirements for such an easement are met.

*Kasiborski, Ronayne & Flaska* (by *Joseph J. Bernardi*), for the plaintiffs.

*Seyburn, Kahn, Ginn, Bess, Deitch and Serlin, P.C.* (by *Barry M. Rosenbaum*), for the defendants.

Before: ZAHRA, P.J., and SAAD and GAGE, JJ.

GAGE, J. Plaintiffs Plymouth Canton Community Crier, Inc., and Fleet Street Association, II, filed this

action to enjoin defendants Thomas Prose, Maria Prose and General Medicine, P.C., from interfering with plaintiffs' use of an area at the rear of plaintiffs' building for purposes of loading and unloading vehicles. The area in question was subject to an express easement agreement, but defendants asserted that the express easement did not include plaintiffs' loading or unloading activities.[1] Plaintiffs alternatively argued that if the express easement agreement was inapplicable, they nevertheless had acquired a prescriptive easement to load and unload their vehicles in the easement area. The matter was decided by the trial court on stipulated facts. The court concluded that the express easement agreement did not contemplate plaintiffs' loading or unloading of vehicles, but that plaintiffs had established a prescriptive easement for this purpose. Defendants appeal as of right, and plaintiffs cross appeal the trial court's ruling with respect to the express easement's scope. We affirm.

I

Defendants contend that the available evidence does not support plaintiffs' establishment of a prescriptive easement to load and unload vehicles in the disputed area. An easement represents the right to use another's land for a specified purpose.

---

[1] The disputed 1971 easement provision states as follows:

Another said license and easement shall be the right of the owner of Lot 139a [the property plaintiffs currently occupy/own] to use for pedestrian or vehicle travel, in common with the owner of the remainder of Lot 139 [the property defendants currently occupy/own], excluding use by either owner for parking or other use, that portion of Lot 139 described as follows . . . .

*Schadewald v Brulé*, 225 Mich App 26, 35; 570 NW2d 788 (1997).[2] An easement by prescription results from use of another's property that is open, notorious, adverse, and continuous for a period of fifteen years. MCL 600.5801; MSA 27A.5801; *Goodall v Whitefish Hunting Club*, 208 Mich App 642, 645; 528 NW2d 221 (1995). Mere permissive use of another's property, however, will not create a prescriptive easement. *Banach v Lawera*, 330 Mich 436, 440-441; 47 NW2d 679 (1951). "In order to establish their right to the relief sought, the burden rested on the plaintiffs to show by satisfactory proof that the use of [defendants' property] . . . was of such character and continued for such length of time as to ripen into an easement by prescription." *Id.* at 439.

Defendants initially suggest that plaintiffs cannot have acquired a prescriptive easement because the stipulated facts indicate that plaintiffs (and their predecessors) and defendants' predecessor (National Bank of Detroit, hereinafter NBD) both used the easement area for loading and unloading. According to defendants, this mutual use of the easement area shows that plaintiffs' use was permissive. It appears well established, however, that exclusive use, in the sense of use by only one individual or entity, of another's land is not required to establish a prescriptive easement.

> "To establish an easement by prescription there must be: *First*, continued and uninterrupted use or enjoyment; *second*, identity of the thing enjoyed; *third*, a claim of right

---

[2] "An easement does not displace the general possession of the land by its owner, but merely grants the holder of the easement qualified possession only to the extent necessary for enjoyment of the rights conferred by the easement." *Schadewald, supra* at 35.

adverse to the owner of the soil known to and acquiesced in by him. The accepted rule is that the user must be exercised by the owner of the dominant tenement, and must be open, peaceable, continuous, and as of right. It is sometimes declared that it must also be exclusive, but the term 'exclusive use,' does not mean that no one may use the way except the claimant of the easement. It means no more than that his right to do so does not depend on a like right in others." [*St Cecelia Society v Universal Car & Service Co*, 213 Mich 569, 577; 182 NW 161 (1921), quoting 9 RCL, Easements, § 33.]

"It cannot be said that, because other persons than this defendant used this stairway, his use was not exclusive. In *Schmidt v Brown*, 226 Ill 590; 80 NE 1071 [(1907)], it was held that because other persons besides the claimant of a right of way used it, did not prevent the claimant's user from being exclusive, since exclusive use means that his right does not depend on a like right in others. [*St Cecelia, supra* at 578, quoting *First Nat'l Bank v VandenBrooks*, 204 Mich 164, 178; 169 NW 920 (1918). ]

See also *West Michigan Dock & Market Corp v Lakeland Investments*, 210 Mich App 505, 511; 534 NW2d 212 (1995) (An easement by prescription requires elements similar to adverse possession, except exclusivity.). Because in this case no indication exists that plaintiffs or their predecessors ever utilized the easement area for loading and unloading pursuant to another's claim of right, we find without merit defendants' contention regarding exclusivity.

Defendants also claim that plaintiffs' (and their predecessors') and NBD's mutual use of the easement area for loading and unloading activities, together with the absence of any objection by NBD to plaintiffs' loading activities, demonstrates that plaintiffs' use of the easement area did not qualify as hostile. The parties stipulated that "[p]laintiffs have established all

the elements of a prescriptive easement except the single element of 'hostility' or 'adversity.' "

This Court has described the required element of hostility or adversity as follows:

> "The term 'hostile' as employed in the law of adverse possession is a term of art and does not imply ill will. Nor is the claimant required to make express declarations of adverse intent during the prescriptive period. Adverse or hostile use is use inconsistent with the right of the owner, without permission asked or given, use such as would entitle the owner to a cause of action against the intruder [for trespassing]. See *Rose v Fuller*, 21 Mich App 172; 175 NW2d 344 (1970); also, 25 Am Jur 2d, Easements and Licenses, § 51, pp 460-461." [*Goodall, supra* at 646, quoting *Mumrow v Riddle*, 67 Mich App 693, 698; 242 NW2d 489 (1976).]

Use of another's property qualifies as adverse when made under a claim of right when no right exists. *Outhwaite v Foote*, 240 Mich 327, 329; 215 NW 331 (1927); *Cook v Grand River Hydroelectric Power Co, Inc*, 131 Mich App 821, 826; 346 NW2d 881 (1984). See also 1 Restatement Property, Servitudes, 3d, § 2.16, comment f, pp 228-233 ("To be adverse . . . a use must create a cause of action for interference with an interest in property like trespass, nuisance, or interference with a servitude benefit. To be adverse, the use must be made without authority and without permission of the property owner.").

The stipulated facts established the following relevant background:

> 5. Fleet Street Association, II is owner of the Crier Building [since 1982].

\*     \*     \*

8. Prior to 1971 both the Crier Building and NBD Building [the building now owned by defendant Maria T. Prose] were owned and occupied by National Bank of Detroit ("NBD").

9. In 1971 the Crier Building was sold to a partnership consisting of John Thomas ("Thomas") and James Jabara ("Jabara").

10. From 1971 to 1978, the ground level of the Crier Building was occupied by Hugh Jarvis Gifts, Inc. and the NBD Building continued to be occupied by NBD . . . .

11. From 1978 to 1982, the ground level of the Crier Building was occupied by Plymouth Office Supply Company and the NBD Building continued to be occupied by NBD . . . .

12. From 1982 to the present, the ground level of the Crier Building has been occupied by Crier.

13. NBD continued to occupy and own the NBD building until 1994, when NBD sold the NBD Building to General Medicine, P.C. who leased the building to NBD.

\*       \*       \*

25. The Easement Agreement was negotiated between Robert Barbour, of NBD, Jabara and Thomas in 1971. Since NBD was selling the Crier Building, it was recognized that an easement was necessary to allow the Crier Building access to Fleet Street from the ground level doors at the rear of the building.

26. The Easement Agreement was drafted by NBD.

27. James Jabara and Robert Barbour, of NBD, would testify that the Easement Agreement was intended to allow pedestrian and vehicle travel, including loading and unloading from the Crier Building's ground level doors to delivery trucks and vehicles backing onto the easement area.

\*       \*       \*

30. From 1971 to 1994, following the execution of the Easement Agreement and the sale of the Crier Building, NBD would receive and deliver goods, merchandise and supplies through the rear door of the NBD building from or to vehicles that would back onto and stop in the easement area . . . .

31. From 1971 to the present, following the execution of the Easement Agreement and the sale of the Crier Building, occupants of the lower level of the Crier Building would receive and deliver goods, merchandise and supplies through the rear door of the Crier Building from or to vehicles that would back onto and stop in the easement area and load or unload goods . . . .

32. From 1971 to 1994, NBD was aware of the use of the easement area by the occupants of the Crier Building as described above.

33. From 1971 to 1994, NBD did not make an objection to the owners or the occupants of the Crier Building to the use of the easement area as described above.

Jabara, who sold his ownership interest in the Crier Building in 1974, averred in his affidavit that "[i]t was understood at all times after execution of the easement agreement that loading and unloading of trucks and other vehicles on the easement area was a permitted use under the easement agreement." Barbour similarly averred in his affidavit that he and Jabara understood that the easement agreement permitted loading and unloading by the Crier Building's occupants.

Defendants, in their brief on appeal, refer to numerous cases supporting the inarguable proposition that a mutual, permissive use of another's land does not constitute adverse use that may ripen into a prescriptive easement.[3] Were the only available facts of record that (1) both plaintiffs (and their predeces-

---

[3] The Michigan cases noted within defendants' brief include *Banach*, *supra*; *Barbaresos v Casaszar*, 325 Mich 1; 37 NW2d 689 (1949); *Worden v Assiff*, 317 Mich 436; 27 NW2d 46 (1947); *Hopkins v Parker*, 296 Mich 375; 296 NW 294 (1941); *Wilkinson v Hutzel*, 142 Mich 674; 106 NW 207 (1906); *Wood v Denton*, 53 Mich App 435; 219 NW2d 798 (1974). Defendants also cite *Frandorson Properties v Northwestern Mut Life Ins Co*, 744 F Supp 154 (WD Mich, 1990).

sors) and NBD mutually used the easement area to load and unload, and (2) plaintiffs' loading and unloading occurred absent plaintiffs' request for or NBD's express grant or denial of permission, we would in all likelihood conclude that plaintiffs had failed to satisfy their burden of showing prescriptive use. *Worden v Assiff*, 317 Mich 436, 439-440; 27 NW2d 46 (1947); *Wood v Denton*, 53 Mich App 435, 437-438, 440-442; 219 NW2d 798 (1974).

This case, however, involves additional evidence showing that loading and unloading was performed within the easement area pursuant to the mistaken belief that the 1971 express easement permitted such activity. In discussing the prescriptive use requirement, the Restatement of Property, Servitudes, 3d, recognizes that use under an invalid easement may establish an easement by prescription. According to Restatement § 2.16,

> A prescriptive use of land that meets the requirements set forth in § 2.17 [open or notorious use "continued without effective interruption for the prescriptive period"] creates a servitude. A prescriptive use is either
>
> (1) a use that is adverse to the owner of the land or the interest in land against which the servitude is claimed, or
>
> (2) *a use that is made pursuant to the terms of an intended but imperfectly created servitude*, or the enjoyment of the benefit of an intended but imperfectly created servitude. [*Id.* at 221-222 (emphasis added).]

Restatement comment a describes the rationale underlying the rule set forth in § 2.16.

> Prescription operates in two distinct factual situations. In the first, a person begins using property without the consent or authority of the owner and acquires a servitude if the use continues for the prescriptive period and the other

requirements of § 2.17 are met. *In the second situation, people try to create a servitude but fail, initially because they do not fully articulate their intent* or reduce their agreement to writing, or because they fail to comply with some other formal requirement imposed in the jurisdiction. *If they proceed to act as though they have been successful in creating the servitude, and continue to do so for the prescriptive period, the servitude is created by prescription if the other requirements of § 2.17 are met.* In this second situation, prescription performs a title-curing function. Observance of the terms of the servitude for the prescriptive period substitutes for compliance with the required formality because it provides satisfactory proof of the existence and terms of the servitude and resolves any doubts as to the parties' intent that may have been created by their failure to comply with the formality.

Although this title-curing function of prescription has always been present in American servitudes law, the courts' and commentators' focus on statute-of-limitations theory . . . has generated a vocabulary that tends to obscure it. Traditionally, prescriptive uses are described as necessarily hostile or adverse. To fit uses made pursuant to oral grants and other intended, but imperfectly created, servitudes within the hostile or adverse category, courts and commentators explain that the use derogates from the owner's title, or that the use is adverse because it can be made wrongful by revocation of the license created by the imperfect servitude. Although these explanations work most of the time, courts occasionally take the hostile requirement literally and reach the erroneous conclusion that use pursuant to an oral grant cannot give rise to a prescriptive right because it is not adverse.

To avoid these convoluted explanations and the errors that follow literal applications of the terms "adverse" and "hostile," this section adopts a definition of prescriptive uses that straightforwardly recognizes the two types of uses that can lead to prescriptive rights. [*Id.* at 222-223 (emphasis added).]

Compare *Cook, supra* at 826 ("[I]f a claimant has obtained a conveyance of an easement which is ineffective, his use of the subservient estate, made on the assumption that the conveyance was legally effective, is adverse and not made in subordination to the owner of the burdened estate."); *Cheslek v Gillette,* 66 Mich App 710, 714; 239 NW2d 721 (1976) ("While the [available] testimony . . . may not satisfy the statute of frauds for the grant of an easement, it is sufficient to show an attempted grant, thereby dispelling the argument that the use of the driveway was permissive" and helping establish the adverse use element.).

The available evidence reveals that in 1971 plaintiffs' predecessors and NBD intended to execute an easement authorizing the loading and unloading of vehicles in the easement area, but that the imperfectly executed easement did not fully articulate the parties' intent to permit loading activities.[4] Restatement, § 2.16, comment b, p 223. Further evidence showed that the loading and unloading in this case occurred under the mistaken belief that the express easement permitted this activity. This evidence demonstrates "satisfactory proof of the existence and terms of the servitude and resolves any doubts as to the parties' intent that may have been created by their failure to [fully articulate their intent]." *Id.* at 222. We find that the instant use made pursuant to a mistaken interpretation of the easement's scope constitutes prescriptive use. *Id.* at 221-223. We therefore conclude that the trial court did not err in determining that plaintiffs established prescriptive use,[5] and that,

---

[4] See issue II, *infra.*

[5] Although the trial court's analysis did not consider the effect of the parties' attempted easement, we will not reverse when the trial court

consequently, plaintiffs possessed a prescriptive easement for purposes of loading and unloading vehicles.

II

In light of our decision, it is unnecessary to consider plaintiffs' issues on cross appeal. We agree with the trial court, however, that it could not consider parol evidence of the grantors' original intent concerning the scope of the 1971 easement agreement because defendants were not parties to those negotiations and no indication exists that defendants otherwise should have been on notice regarding the 1971 agreement's intended scope. *Lakeside Associates v Toski Sands*, 131 Mich App 292, 298; 346 NW2d 92 (1983). Thus, the easement agreement itself defined plaintiffs' rights to the easement area. *Great Lakes Gas Transmission Co v MacDonald*, 193 Mich App 571, 575; 485 NW2d 129 (1992). Given the constraint on its consideration of parol evidence, the trial court was confined to considering the plain meaning of the terms of the easement agreement. *Goodwin, Inc v Orson E Coe Pontiac, Inc*, 392 Mich 195, 205; 220 NW2d 664 (1974), mod on other grounds 392 Mich 219; 224 NW2d 53 (1974). We cannot conclude that the trial court erred in determining that the agreement's plain language does not permit plaintiffs to stop their vehicles in the easement area for purposes of loading or unloading them when the agreement specifically prohibits parking in the easement area.

Affirmed.

---

reaches the correct result despite erroneous reasoning. *DeHart v Joe Lunghamer Chevrolet, Inc*, 239 Mich App 181, 183; 607 NW2d 417 (1999).